# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2396

RUFINO PENA, GERMAN ALVARADO, ROSA AYALA, et al.,

*Plaintiffs-Appellants*,

v.

AMERICAN MEAT PACKING CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 2763—**Ruben Castillo**, *Judge.*

———————

ARGUED JANUARY 23, 2004—DECIDED MARCH 25, 2004

———————

Before BAUER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* The American Meat Packing Corporation ("AMPAC") closed its Chicago facility on November 16, 2001 without giving its 350 employees prior notice of the plant closing. The employees filed a class action suit against AMPAC for violations of the Worker Adjustment and Retraining Notification Act ("WARN Act"). At issue was whether AMPAC could have reasonably fore-seen the plant shutdown so as to provide the employees

prior notice. The district court found for AMPAC on summary judgment. Plaintiffs appeal; we reverse.

## I. Background

AMPAC acquired its Chicago plant in 1998. Daniel Ochylski was the president of AMPAC; Paul Espinosa was AMPAC's director of operations. The plant conducted the slaughtering, butchering and packing of between 3,000-3,400 "butcher hogs" per day until November 16, 2001 when it closed. The daily processing of the hogs began with the delivery of live hogs and ended with the shipping of neatly packaged, chilled meat to cold storage facilities. In the year prior to its closing, AMPAC's Chicago plant suffered from two problems: it had repeated difficulty maintaining sanitary conditions for the slaughtering and butchering of the hogs, and it was operating at a loss due to recent expenditures to renovate the facility. Ultimately, the plant shut down due to its inability to bring the plant into compliance with United States Department of Agriculture ("USDA") regulations.

According to USDA regulation, "[e]ach official establishment must be operated and maintained in a manner sufficient to prevent the creation of insanitary conditions and to ensure that product is not adulterated." 9 C.F.R. 416.1 (2004). In order to insure compliance with USDA regulation, during its operation, AMPAC had five full-time USDA inspectors at its plant to monitor sanitary conditions. Each morning the inspectors would look over the various areas of the plant to detect insanitary conditions. A reporting system was set up so that plant management was aware of any insanitary conditions that existed, and had a chance to remedy them.

On occasion, the USDA inspectors would issue Noncompliance Records ("NR") to document conditions that were not compliant with USDA standards. When an in-

spector issued a NR it would identify the date and time the insanitary condition was found, and the name of the supervisor notified of the condition. The NRs contained standard language stating, "this document serves as written notification that your failure to comply with regulatory requirements could result in additional regulatory or administrative action," in addition, AMPAC received a handwritten note to the same effect on September 17, 2001. When AMPAC received NRs it was required to respond formally to the USDA. No product could be shipped unless the USDA approved of the production process.

Prior to the plant's shutdown, AMPAC received numerous NRs. Specifically, during 2001 it received one in January, one in February, three in March, four in May, one in July, six in September, eight in October, and at least seven in November. The NRs cited such insanitary conditions as: water dripping onto the product, the presence of grease and oil on hams, rust, hog carcasses on the floor, flaking paint, rodent droppings, and the presence of meat with an open abscess on cutting tables. On September 20, as a result of the NRs, production was stopped temporarily; product was also retained on September 14, 17 and 19.[1] In response, AMPAC took the following corrective actions: it wiped the condensation away, counseled its employees to monitor sanitary conditions at the plant, welded shut a breach in the exhaust system, and installed a new door to reduce airflow.

On October 31, 2001 the USDA withheld inspection after observing a third incident of rodent droppings at the facility; this resulted in a stop in production. In response that same day AMPAC hired a new exterminating service, Ecolab. It also retained a private food safety consultant to audit conditions at the plant. Neither Ecolab nor the new

---

[1] That product was ultimately reconditioned and shipped.

consultant told AMPAC that its building had structural problems, and both represented that they could fix AMPAC's problems. AMPAC sent a report to the USDA on November 1. The USDA resumed inspection only to with-hold it again on November 2 after citing AMPAC with an additional four NRs; AMPAC was forced to cease produc-tion. In response, AMPAC continued to try to improve its facilities. It requested its employees help keep the facility clean, retained an attorney to communicate with the USDA on its behalf, asked the Chicago Department of Public Health to rodent-proof an abandoned building ad-jacent to the facility, and invested 1500 man hours in an intensive cleaning over the weekend at a cost of $34,000.[2] The USDA was unpersuaded; it suspended its assignment of USDA inspectors at the facility on November 5, 2001. AMPAC was unable to ship some one million pounds of meat, valued at $638,000.

AMPAC continued its efforts to bring the facility into compliance with USDA regulations. It took the following actions: AMPAC retained another outside expert to assess the facility, had Ecolab visit the facility and install over one-hundred additional traps, retained the American Igloo company to study and identify airflow problems that could be causing the condensation problems, had management review and update policy for meeting USDA requirements, solicited quotes for the cost of testing the retained product for contamination, assessed the cost for possibly repairing a cooler, and it formed a crisis team to identify and correct regulatory issues.

On November 7, AMPAC requested permission from the USDA to ship its product; the USDA denied the request and

---

[2] The cleaning effort included purchasing a new stainless steel augur belt, plugging holes, covering previously uncovered floors and beams, removing unused overhead apparatus and cleaning the rendering building.

ordered the product be destroyed. On November 14, AMPAC received information that repairs to its coolers would cost $3 million and would take six months to complete. On November 15, Ochylski again corresponded with the USDA, detailing its efforts to improve the facility and outlining its plan to spend the $3 million to upgrade the cooler if USDA allowed them to continue operating. The USDA responded that the measures taken up to that point were unsatisfactory, and AMPAC could not resume operations. The USDA also ordered AMPAC to destroy an additional 1.2 million pounds of previously inspected and approved product, worth about $545,500. On November 15, Ochylski decided to close the plant the following day; notice was sent to employees on November 16.

## II.  Discussion

The district court granted AMPAC's motion for summary judgment, stating that the USDA's actions, resulting in the closure of the plant, were not reasonably foreseeable. We review the district court's decision to grant summary judgment de novo. *Brademas v. Indiana Hous. Fin. Auth.*, 354 F.3d 681, 685 (7th Cir. 2004). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In determining whether summary judgment was appropriate we consider the evidence in the light most favorable to the Plaintiffs.

The WARN Act requires employers, such as AMPAC, to give its employees 60 days' advance notice of a plant closing. 29 U.S.C. § 2102(a). The purpose of the statute is to provide workers transition time to seek alternative jobs and, if necessary, seek retraining to allow them to successfully compete in the job market. 20 C.F.R. § 639.1 (2004). Under WARN, the required 60-day notice period may be reduced or eliminated if the closing was caused by

"business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). Such unforeseen business circumstances must be, "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1).

The Department of Labor has been hesitant to create *per se* rules as to what constitutes unforeseen business circumstances, and encourages a case-by-case examination of the facts. *Hotel Employees and Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 180 (3d Cir. 1999); 54 Fed. Reg. 16,062, 16,062-63 (April 20, 1989). In these situations, the Third Circuit has aptly noted, "[w]hat is a harbinger of disaster in one context may be an everyday occurrence in another." *Elsinore*, 173 F.3d at 186. In determining whether business circumstances were "unforeseeable" we do not consider the employer's own subjective assessment, but rather whether it had exercised, "such commercially reasonable business judgment as would a similarly situated employer." 20 C.F.R. § 639.9(b)(2) (2004). In this case we consider whether a similarly situated meat packing facility would have foreseen heightened USDA actions in November given AMPAC's experiences during the prior months.

The Federal Regulations contemplate the situation before us and explicitly state that "[a] government ordered closing of an employment site . . . may be an unforeseeable business circumstance." 20 C.F.R. § 639.9(b)(1) (2004).[3] The

---

[3] In discussing such government actions, the Department of Labor differentiated government actions that *directly* order the closing of a business (as contemplated in the Regulations) and government actions that *indirectly* do so (as discussed in the Commentary). Indirect closings occur in such situations where an

(continued...)

commentary to the regulations instructs that, "[d]epending on the length of the notice given, a claim that [indirect government] closings qualify for reduced notice under the unforeseeable business circumstances exception *may* be available." 54 Fed. Reg. 16,042, 16,053-54 (April 20, 1989) (emphasis added).

AMPAC argues that it was excused from its notification requirement because the actions taken by the USDA in mid-November were sudden and "not reasonably foreseeable" in September. AMPAC believes the following three actions by the USDA led to its decision to close the plant: its November 5 suspension of inspection, its combined November 7 and 15 orders to destroy over 2 million pounds of meat, and its November 15 insistence on costly repairs to the cooler at the facility. Whether these actions were reasonably foreseeable depends on how a similarly situated manager of a meat packing facility would react armed with the knowledge of the conditions of its facility, the extent of its attempts to repair the facility, and how the USDA generally operates with regard to non-compliance with sanitation regulations. We know that by mid-September (60 days prior to the closing) AMPAC was receiving an escalating number of NRs. Plaintiffs contend that AMPAC's President, Ochylski, was aware of the problematic conditions of the facility as far as a year earlier, as evidenced by plans in 2000 to improve the coolers that were later scrapped. Record at 23, ¶ 145-47

---

(...continued)

agency, "take[s] enforcement actions which might result in the closing of a plant by the employer either to remedy the violation or because it cannot continue to operate." 54 Fed. Reg. 16,042, 16,053-54 (April 20, 1989). The commentary goes on to state, "[s]uch [indirect] closings, although they may result from a government action, are not government ordered and are not subject to the same treatment." *Id.* The USDA's actions are properly classified as an indirect closing of AMPAC's facility in Chicago.

(Statement of Uncontested Facts). They also assert that he knew the remedial actions he was taking in response to the NRs were ineffective to correct the underlying problems due to the receipt of multiple citations for the same problems, and the relatively small amount of money expended to correct the conditions. Br. of Plaintiffs-Appellants at 16, 20. Finally, Plaintiffs believe that Ochylski was unfamiliar with USDA procedures and the seriousness of NRs. Record at 30, ¶ 34 and 184. In short, they contend that a similarly situated business person, exercising reasonable commercial judgment would have foreseen in September the escalating NRs would result in the USDA's November actions, causing the plant to close.

Case law on this topic is sparse and offers us little guidance. The most similar fact pattern arose in the Third Circuit. *Elsinore*, 173 F.3d at 175. In that case a casino was shut down when a government agency refused to renew its license due to the casino's ongoing financial difficulties. The court held that the shutdown was unforeseeable because the commission in question had never before refused to renew a casino license "even for applicants in serious financial distress." *Id.* at 186. In this case, AMPAC hopes to align itself with *Elsinore* by asserting that Ochylski and Espinosa had a combined fifty years of experience operating slaughterhouses, and had never experienced similar harsh actions on the part of the USDA following the issuance of NRs. In our case the waters are further muddied by the fact that beginning in January 2000 the USDA implemented new rules regarding sanitation requirements for meat and poultry establishments. The new rules were to be results-driven standards, rather than a list of dos and don'ts. The Commentary to the Regulations contemplates such situations and states that changes in agency rules are not always unforeseeable because "regulatory changes are often preceded by lengthy notice and comment procedures, [and] often have delayed effective dates." 54 Fed. Reg. 16,042,

16,062-63 (April 20, 1989). This analysis seems appropriate to our situation, given the fact that the USDA published its proposal for these changes in 1997. So, even though Ochylski and Espinosa had not previously experienced a plant shutdown due to USDA withholding of inspection following its issuance of multiple NRs, a reasonable, similarly situated business person might have foreseen that the new USDA rules would result in such actions, especially given the fact that the new rules focused on results (rather than efforts), and AMPAC had been unable to provide effective remedies to its sanitation problems.

Viewed in a light most favorable to Plaintiffs, we think that there exists a genuine issue of material fact as to whether the business conditions that caused AMPAC to close its facility were unforeseeable. Further, if the conditions were unforeseeable, it is unclear whether this qualifies AMPAC for merely a reduction in its required notice period or the complete elimination of it. We believe these questions are best answered by a finder of fact. For this reason, we REVERSE.

A true Copy:

      Teste:

                         _____

                      *Clerk of the United States Court of Appeals for the Seventh Circuit*