# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-1616 & 04-1838

NANCY J. ROQUET and CORETTA ROBINSON,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

v.

ARTHUR ANDERSEN LLP,

*Defendant-Appellee,*
*Cross-Appellant.*

_____

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 2689—**John W. Darrah**, *Judge.*

_____

ARGUED OCTOBER 28, 2004—DECIDED FEBRUARY 9, 2005

_____

Before RIPPLE, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This case involves the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109, better known by its shortened name, the WARN Act. The Act became law in 1989, and its purpose is to soften the economic blow suffered by workers who unexpectedly face plant closings or mass layoffs. Among other things, the Act requires that companies subject to its

reach (generally large employers) give employees 60 days notice in advance of any mass layoffs or plant closings. The notice gives affected workers a little time to adjust to a job loss, find new employment, or, if necessary, obtain retraining.

Our case, however, is not your typical WARN Act fare as it involves hot-button topics like "Enron," "document shredding," and "indictment." And it concerns an exception to the WARN Act's notification requirement:  the Act's 60-day-notice obligation is eliminated, or reduced to a shorter term, if a mass layoff or plant closing is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." *Id.* § 2102(b)(2)(A). The defendant here, the giant accounting and consulting firm Arthur Andersen LLP, convinced the district court that its failure to comply with the Act was excused by the exception we just quoted. The plaintiffs, a purported class of former Andersen employees, are here challenging that decision on appeal.

First, a little background. As of early 2002, Andersen had over 27,000 employees in 80 locations throughout the country. In addition to providing direct accounting and consulting services for clients, Andersen performed administrative support services for approximately 80 international practice firms that used the Andersen name. One of the firm's major clients was the Enron Corporation, the infamous Houston, Texas, energy marketer that fell like a house of cards in 2001 when it came to light that the company had grossly misstated its earnings. Andersen was at the center of Hurricane Enron—it audited the company's publicly filed financial statements and provided internal counseling. *See United States v. Arthur Andersen, LLP*, 374 F.3d 281 (5th Cir. 2004).

In November of 2001, Andersen received bad news in the form of a subpoena from the SEC requesting Enron-related documents. During the course of its investigation, the SEC discovered that Andersen employees destroyed thousands

of relevant documents in the 6 weeks leading up to its receipt of the subpoena. Over the next few months, the media began to speculate about Andersen's continuing viability. Stories also circulated that Andersen's employees were concerned about layoffs and that some of the company's clients were contemplating defection.

During this time, Andersen worked hard to try to resolve its Enron-related ills with the SEC and the Department of Justice (DOJ). As of February 22, 2002, Andersen had not suffered a significant loss of business nor was it giving any thought to a mass layoff. That day, Andersen's lawyers met with lawyers from the DOJ. The next day, counsel briefed Andersen's management team, and a participating manager e-mailed the following update to employees:

> At our meeting on Saturday, February 23, the current status of the investigation into document destruction was presented by the outside lawyers from Davis Polk. They are moving forward as quickly as possible to bring this matter to a conclusion as it relates to the Firm with the Department of Justice. Our desired timetable is to be in a position at the end of February to have the desired conclusion and an agreement in principle with the DOJ, so that we can finalize our disciplinary actions and prepare an internal announcement followed closely by a public announcement of the resolution of this investigation.

Discussions continued over the next few days.

On March 1, the DOJ delivered dire news—it was going to seek an indictment of the company. Andersen tried to convince the DOJ to change its mind, but to no avail. On March 7, an Andersen managing partner, Terry Hatchett, sent an e-mail informing employees that the firm was "presently engaged in discussions with the Department of Justice regarding the parties' respective views" and that "[n]o final conclusions have been reached." That very day, however,

the DOJ filed a sealed indictment charging the firm with obstructing the SEC investigation by destroying and withholding documents (18 U.S.C. § 1512(b)(2)). On March 13, Andersen's lawyers asked the DOJ to defer prosecution of the company and focus instead on culpable individual employees. The DOJ refused to budge, and on March 14 the indictment was unsealed.

To the surprise of no one, news of the indictment triggered massive client defection. From March 15 to the 31st, Andersen lost $300 million in business. During this time period, the practice group on West Monroe Street in Chicago alone lost $57 million, roughly 14 percent of its fees. To put the gravity of these losses in perspective, the firm had lost only $5 million, or 1 percent, in the 10 weeks preceding the indictment. On March 28, Andersen announced that it was eliminating support services for its international network, which would result in additional revenue loss.

In light of these setbacks, and with additional hemorrhaging expected, Andersen decided to lay off thousands of employees. On April 8, management at West Monroe gave notices of termination to 560 employees, including Nancy Roquet and Coretta Robinson, the named plaintiffs in this suit. After receiving notice, Roquet remained on the payroll for 2 weeks and Robinson for 5 weeks. Andersen also made major cuts at its North Michigan Avenue site in Chicago as well as at its training facility in St. Charles, Illinois.

Roquet and Robinson filed a class-action complaint in federal district court alleging that Andersen violated the WARN Act by failing to give 60 days notice to its workers before laying them off. They sought back pay and lost benefits. In August of 2002, the court certified a class consisting of workers from the two Chicago sites and the St. Charles facility. Both sides eventually moved for summary judgment on the issue of whether Andersen's workforce reduction qualified as a "mass layoff" under the Act. The court concluded that it did and granted the plaintiffs' motion.

The parties then moved for summary judgment on the question of whether Andersen was exempt from liability under the WARN Act's "unforeseen business circumstances" exception. The district court concluded that the need for layoffs was not reasonably foreseeable 60 days before the decision was made and entered summary judgment in favor of Andersen. The plaintiffs appeal that decision, which we review *de novo*.

In evaluating this appeal, we note that the Department of Labor has provided some guidance regarding when the "unforeseen business circumstances" exception applies. In doing so, however, the agency eschewed *per se* rules and instead encouraged a case-by-case examination of the facts. *See Pena v. Am. Meat Packing Corp.*, 362 F.3d 418, 421 (7th Cir. 2004). A business circumstance may be reasonably unforeseeable if it was caused by some sudden, dramatic, and unexpected action, or by conditions outside the employer's control. 20 C.F.R. § 639.9(b)(1). When determining whether a mass layoff was caused by unforeseeable business circumstances, courts evaluate whether a similarly situated employer exercising reasonable judgment could have foreseen the circumstances that caused the layoff. *Id.* § 639.9(b)(2). Thus, a company will not be liable if, when confronted with potentially devastating occurrences, it reacts the same way that other reasonable employers within its own market would react. *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1061 (8th Cir. 1996).

The parties dispute whether Andersen established either element of the exception—causation and foreseeability. *See Jurcev v. Cent. Cmty. Hosp.*, 7 F.3d 618, 622-27 (7th Cir. 1993). The district court concluded that the need for mass layoffs was caused by the public announcement of the indictment on March 14. We agree. Up until then, Andersen suffered no marked loss of business despite a spate of negative publicity. It is clear that economic hemorrhaging really

did not begin until word of the indictment got out. The plaintiffs contend that Andersen's felonious misconduct caused the layoffs, not the indictment. But, while it is true that the illegal acts of some Andersen employees were the root cause of the firm's ultimate downfall, not until the indictment became public did it feel the pain. Had the DOJ indicted only individual Andersen employees instead of the firm as a whole, or targeted only the Houston office, the layoffs here may never have occurred.

The heart of the dispute in this case centers on foreseeability. In determining whether a crippling business circumstance is foreseeable, we must bear in mind that "it is the 'probability of occurrence that makes a business circumstance "reasonably foreseeable,"' rather than the 'mere possibility of such a circumstance.'" *Watson*, 311 F.3d at 765 (quoting *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998)). The layoffs began on April 23, which means that Andersen was required to notify employees 60 days earlier, or February 22. The plaintiffs argue that the indictment was reasonably foreseeable on that date because "the DOJ disclosed to Andersen that an indictment was highly probable." But the record does not support this position. The plaintiffs point to Andersen's meeting with the DOJ on February 22 and its subsequent efforts to fight off an indictment. The February 23 e-mail summarizing that meeting, however, makes no mention of the firm being indicted. And Andersen's subsequent negotiations with the government do not mean that it knew an indictment was likely. Possible? Certainly. But probable? No. *See Halkias*, 137 F.3d at 336 (business circumstances triggering layoff must be "probable" to be reasonably foreseeable; a lesser standard of "possibility" would be impracticable). Indeed, as of February 22 it was not a foregone conclusion that Andersen would be indicted as a company—in the past, the government typically went after culpable individuals, not

companies as a whole.[1] By all accounts, this was an unusual move by the DOJ. There is evidence in the record suggesting that Andersen could have reasonably foreseen the indictment by March 1—the date it was told by the DOJ that it was being indicted. But hope still remained that the dreaded act could be stalled if not avoided.

We believe that a reasonable company in Andersen's position would have reacted as it did. Confronted with the possibility of an indictment that threatened its very survival, the firm continued to negotiate with the government until the very end and turned to layoffs only after the indictment became public. The plaintiffs argue that Andersen should have notified employees of layoffs on February 22. We do not agree. At that point, Andersen had not yet lost business or been indicted. Indeed, in our view, a mass layoff at that point would have been a poor business decision. What if the government decided not to indict the firm as a whole, or waited 6 months to make the decision? The only reason for providing notice so early would be to ward off potential WARN Act liability. But, as the Sixth Circuit explained in *Watson*, the WARN Act is not intended to deter companies from fighting to stay afloat:

> WARN was not intended to force financially fragile, yet economically viable, employers to provide WARN notice and close its doors when there is a *possibility* that the business may fail at some undetermined time in the future. Such a reading of the Act would force many employers to lay off their employees prematurely, harming precisely those individuals WARN attempts to protect. A company that is struggling to survive financially

---

[1] This rather unprecedented step will be considered soon by the Supreme Court, which just recently agreed to consider whether indicting (and convicting) the company as an entity was a proper application of 18 U.S.C. § 1512(b)(2).

> may be able to continue on for years and it was not Congress's intent to force such a company to close its doors to comply with WARN's notice requirement.

311 F.3d at 765. These same concerns were at play here. Thus, Andersen's failure to notify employees earlier than it did was not unreasonable.

The plaintiffs argue that the layoffs were foreseeable as a matter of law under 20 C.F.R. § 639.9(b)(1) because the indictment was not sudden, dramatic, and unexpected nor outside the employer's control. In their view, Andersen was long aware of its misconduct, and punishment for that misconduct was inherently foreseeable. But the indictment was certainly sudden and dramatic in that Andersen did not know if it would be indicted as a firm. Nor did Andersen really know when the indictment would be returned until the act occurred. Again, the WARN Act deals in reasonable probabilities, not possibilities. Moreover, an employer does not have to be caught completely off guard by a dire business circumstance for it to be "sudden, dramatic, or unexpected." Case law reveals that WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception. *See Jurcev*, 7 F.3d at 626 (hospital entitled to the exemption despite awareness of precarious financial condition and potential loss of funding which ultimately led to its closing); *Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 186 (3rd Cir. 1999) (casino owner entitled to exception where it could not be sure if or when gaming commission would revoke its license); *Loehrer*, 98 F.3d at 1062 (defense contractor exempt despite being aware that government might cancel bomber/fighter contract).

Our dissenting colleague tells us that "Andersen knew enough 'long before' April 8, 2002, to give the required statutory notice to its employees." (We've added the internal

quotation marks.) That's an odd statement, for the statutory notice requires 60 days, and the dissent goes on to tell us in the same paragraph that the "impending catastrophe was not foreseeable as of February 22, 2002. So, by that count alone, "long before" April 8 (when notice was given) is at best 45, not 60, days. And "long before" eventually becomes shorter still as the dissent settles on March 1, 38 days before the April 8 notice actually went out, as the trigger date. While we concede that an argument could be made that March 14, the date the indictment was unsealed, *could* be viewed as a WARN Act trigger date (which would further shorten the "long before" window to 25 days), we don't think it should be so viewed. We think the company, faced with this unprecedented cataclysmic event, reasonably needed a little time to assess how things would shake out. And it was not unreasonable for the company to think it could survive the carnage until early April, when on the 8th it ran up the white flag of surrender and gave the bad news to its employees.

The lead time in the notice Andersen ended up giving varied from employee to employee. Our two named plaintiffs, for example, got 2 (Roquet) and 5 (Robinson) weeks notice before they were out of work. Given the situation here, and the "business circumstances" exception in § 2102(b)(2)(A), Andersen, although deserving of no roses for the acts of some of its agents in the Enron mess, did not violate the WARN Act by giving the notice as it did on April 8.

We also reject the notion that the timing of the notice was under Andersen's control. The plaintiffs are confusing Andersen's responsibility and culpability for its misbehavior with its "control" over the indictment within the meaning of the regulation. Stated simply, Andersen could not indict itself. Andersen was not like a company that secretly plotted for a long time to move its operation to Mexico and closed up shop without any notice to its employees.

Andersen has appealed the district court's entry of summary judgment for the plaintiffs on the question of whether its workforce reduction constituted a "mass lay-off" under the Act. But because we agree with the court's dismissal of the suit under the WARN Act's "unforeseen business circumstances" exception, we need not address the contention.

The judgment of the district court is AFFIRMED.

WOOD, *Circuit Judge*, dissenting.  No one could dispute the majority's observation that the layoffs involved in this case were high-profile. The pages of the country's newspapers in 2001 and 2002 were filled for weeks, if not months, with the unfolding Enron story and the role that Enron's advisors, including Arthur Andersen, played in that saga. Nonetheless, the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109, (the WARN Act) applies to all cases, not just to those that are dull enough to stay below the press's radar screen. The majority finds here that Andersen was entitled to take advantage of the unforeseen circumstances exception to the obligation to notify affected workers 60 days prior to a mass layoff or plant closing. In so holding, it either finds that notice was impossible right up to April 8, 2002, when the employees finally received the bad news, or it finds that the statute as a matter of law takes an all-or-nothing approach—if 60 days' notice is impossible, then no notice at all is required. Neither one of those possibilities is correct, in my opinion; the first fails as a matter of fact, and the second as a matter of law. I would find that notice was possible, and thus

required, no later than March 1, 2002, and I would remand for further proceedings on that basis.

First, a review of the facts shows that Andersen knew enough long before April 8, 2002, to give the required statutory notice to its employees. Plaintiff Nancy Roquet remained on the payroll for two more weeks, until April 23, which was the date when the mass layoffs began. Under the statute, therefore, she and the many other Andersen employees in her position should have received notice of their terminations no later than February 22, 2002, assuming critically that Andersen realized that the firm was about to crumble. Although the plaintiffs have argued strenuously that Andersen knew enough as of that date to trigger the notice obligation, I agree with the majority that the impending catastrophe was not foreseeable as of February 22, 2002. At that point, despite the negative Enron publicity, Andersen had not experienced a significant loss of business. Its lawyers advised it on February 23 that they were moving quickly to a resolution of the matter with the Department of Justice (DOJ). The tone of the e-mail sent to the employees, reproduced *ante* at 3, suggests that the firm believed that some heads would roll, but that the firm itself would carry on.

This relatively positive outlook was shattered on March 1, when the DOJ informed Andersen that it was about to be indicted. No one could have been in any doubt about the grim prospects the firm faced after indictment. Such a drastic step was close to unprecedented, as the many articles commenting on it after-the-fact observed. See, *e.g.*, Editorial, *Frontier Justice*, WALL ST. J., March 18, 2002; James O'Toole, *Spreading the Blame at Andersen*, N.Y. TIMES, March 26, 2002, at A25. (Indeed, the Supreme Court has just granted *certiorari* in Andersen's criminal case, indicating that it is yet to be determined whether the firm should have been convicted. See *Arthur Andersen LLP v. United States*, No. 04-368, *cert. granted*, 125 S. Ct. 823 (Jan. 7, 2005.) Even

though Andersen made a last-ditch effort to persuade DOJ to change its mind, it knew that it was in serious trouble. The DOJ does not lightly tell firms that a grand jury is about to indict them, after all. Under the WARN Act, this was enough to trigger its legal obligation to give notice to its employees. By this time, to put the point in terms of the statutory exception to the 60-day rule, it was at least "reasonably foreseeable" to the firm that the closing or mass layoffs would occur. This does not mean, in my view, that Andersen had to tell its threatened employees the reason why such a drastic restructuring was possible; it simply had the obligation to tell them that their jobs were at risk. And indeed those jobs were at risk: on March 7, as promised, DOJ filed a sealed indictment charging the firm itself with obstruction of justice. A week later, on March 14, the indictment was unsealed. Predictably, the news of the indictment dealt a body-blow to the firm, as the majority has recounted. Facing massive losses in business, Andersen gave notice to 550 of its employees on April 8 that they were going to be terminated; a short two weeks later, the departures began.

The facts simply cannot bear the interpretation that the necessity for mass layoffs was not reasonably foreseeable prior to April 8. Thus, if this is the true rationale of the majority's opinion, I cannot subscribe to it. It is also possible, though by no means necessary, to read the majority's opinion as holding that if the need for the layoffs was not reasonably foreseeable at the 60-day mark (February 22), then no notice at all was required by the statute. In *Pena v. American Meat Packing Corp.*, 362 F.3d 418 (7th Cir. 2004), this court left open the question whether a sufficient unforeseen circumstance occurring within the 60-day window excuses an employer from providing any notice at all, or if instead it merely reduces the amount of notice required. See *id.* at 422 ("Further, if the conditions were unforeseeable, it is unclear whether this qualifies AMPAC for merely a reduction in its required notice period or the complete elimination of it.").

In my view, we should reach that question in the case before us. Taking into account the language and purpose of the WARN Act, we should hold that the 60-day period is merely reduced, not eliminated, when the necessity for a mass layoff or plant closing becomes apparent within that time period. Indeed, immediately after describing the unforeseen circumstances exception, the statute reads: "An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). If the all-or-nothing rule is truly being adopted by the majority, it is creating a conflict with the Eighth Circuit, see *Burnsides v. MJ Optical, Inc.*, 128 F.3d 700, 704 (1997) (finding that the "unforeseeable business circumstances defense still requires [an] employer to give as much notice of closing as practicable once [the] causal event becomes known"), and the opinion should be circulated under Circuit Rule 40(e). The Third and Fifth Circuits also appear to be on the side of the Eighth on this issue. The Third Circuit has written that "in the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated." *Hotel Employees and Rest. Employees Intern. Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999). Although the Fifth Circuit in *Halkias v. General Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998), afforded the employer a week to provide notice once the probability of the mass layoff became foreseeable, it did so only because it accepted that the employer provided as much notice as was practicable.

The crucial date under the WARN Act is not the date when the company *knows* that a mass layoff is imminent, nor is it the date when the company finally gets around to identifying the exact employees affected by the mass layoff. The Act states plainly that the trigger date is the date when a mass layoff is "reasonably foreseeable." As soon as it is probable that a mass layoff will occur, the employer must provide notice as soon as is practicable. Here, Andersen knew

of the indictment on March 1, yet it waited over five weeks before providing any notice to its employees.

This is not a trivial point for the employees concerned. Under my view of the statute, Roquet should have received notice on March 1 (which, obviously, is less than 60 days prior to her actual date of layoff, April 23) or very shortly thereafter. Under the most conservative approach I can imagine, she should have received notice on March 14, when the indictment was unsealed and the hemorrhaging began. (Given the majority's disposition, there is no need to resolve which date is correct; I would remand this question as well to the district court). Using March 1, her notice was 38 days late; using March 14, it was 25 days late. She should receive compensation for that time period. For other employees, the time periods between date of notice and date of layoff will differ, depending on when they actually lost their jobs. Robinson stayed for five weeks after April 8; a full 60 days' notice would have been possible for her.

The majority worries that giving the required WARN Act notice might exacerbate problems for a floundering company. While this may be true, the fact is that Congress weighed the interests of companies and workers in the statute, and it drew the 60-day line we have. Companies can protect themselves to a certain degree in the wording of the notices they give. As I stated above, the company need not be able to identify each affected employee by name; a general notice, alerting the employees as a group to the possibility of a layoff, is what the statute requires. Finally, at least on the present facts, Andersen's troubles were not exactly a state secret. There was nothing left to hide after March 14, when the indictment hit the front pages of the country's newspapers. By March 1, it was reasonably foreseeable to the firm that it would need to reduce its staff drastically.

For these reasons, I would reverse and remand for further proceedings. I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—2-9-05