**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DALE GROSS; JAMES BAGWILL;
LAVETA BARKER; BILLY
BARNES; JIM BENNETT; ROY
BERGERON; KENNETH BEVENUE;
CODY CALICO; HELEN
CAPEHART; ALMA
CHESHEWALLA; RAYMOND
CODY; O W COLLINS; CHRIS
COUCH; SAMUEL DOBSON; GINA
DOSS; JASON DRAKE; ALLEN
FARRIER; KELLY FETZER;
EUGENE FITZPATRICK; BILLY
GAMBLING; EROS GARCIA;
CHRISTOPHER GREEN; WADE
GREEN; MIKEY GRIDER; JAMES
GRISHAM; TIM HANSEN; DARRIN
HARGIS; ANTHONY HAYES; PAUL
HENRY; MARK HICKS; RHONDA
HOUSDAN; DOUGLAS HUDSON;
ROBERT HUGHES; DAVID
JOHNSON; EVELYN JOHNSON;
DAVID KEIM; KAY LANGE; TONY
LAWHORN; DON LINKER; KERRY
MARQUETTE; DAVID MASHBURN;
JOHN MCHENRY; ROBERT
MCKAY; JERRY MCVAY;
MATTHEW MERRELL; DEREK
MILLER; CASEY MILLS; BOBBY
MORRIS; TOMMY MULLINS; MIKE
NOLEN; MICAH PARKS; SANDRA
PARSONS; JIMMY PHILLIPS;
REBECCA PILGRIM; ROBERT
PLETT; MARK PRATHER; JOHN
PRICE; RUSSELL REPLOGLE; LEE
WALKER; NEDRA SANDERS;

No. 08-5028

MICHAEL SANDRIDGE; JOEL SHAFFER; DAVID SHANKLIN; RAYMOND SHINAULT; ROSA SIMS; JOHN SMITH; WAYNE SMITH; FRANK STINEDURF; TIMOTHY SULLIVAN; DAX SWATSENBARG; CARRELL TALLENT; RAYMOND THOMAS; LANNY THOMPSON; MARK THOMPSON; CHARLES THURMAN; SHAY TODD; JOSH VAUGHN; MYRT WALTON; ANDREW WILKERSON; ROBERT WILLIAMS; JAMES WOODCOCK; CLARENCE WOODS; THOMAS YERTON; WENDEL NEAL; TERRY PLILER; MARCIE TROTTER; JOHN PERKINS; DOYLE TREAT; NEAL PITTENGER; MIKE HOPPER; SCOTT VAUGHN; PATSY SMITH; RONALD GRIFFITH; RICHARD GOURD; CURTIS HUGHEY; LARRY E. JOHNSTON; EDWARD MCCLURE; ROSEMARY KELLY; DAVID SHELL; ORVILLE SHOUSE; LEROY FINNING; CORY HANCOCK; SHARON ZWOSTA; LONNIE TEAGUE; ROBERT DIXON; PAUL DAVIS; ROBERT WILLIAMSON; CLIFFORD FENTON; CHRISTOPHER PRESLAR; RITA KEAS; CHRISTOPHER BLACKBURN; JARED ELLIS; DELBERT "SONNY" GOLDEN; AUDIE BRODIE; ROGER FERMAN; JOHN THOMAS; DAVID SMITH; BOBBY TURNER; TIM SATTLER; DARRELL BLAYLOCK; JAY KELLEY; JEFF BURGESS; CHRISTOPHER CLEVELAND; JOHNNY DISMUKE; TERRY

WILLIAMS; ELMER WESLEY; MARSHALL DARNELL WILSON; ALBERT HULL; JAMES COOLEY; ROBERT NELSON; JIM BENIGAR; TIM LONG; DANIEL WELLS; DAVID HARRISON; RANDY LORANCE; CURTIS TYNER; ERIC WALKER; JAMES BASH; HARRISON FISHER; DALE SPEAKMAN; JOHN SCHNEIDER; DAVID NESBIT; MICHAEL COX; OCIE STOCKHAM; TRACY CONWELL; LARRY SCHUTTLER; CHARLES HARRIS; BART HALL; CLAYTON IRBY; THOMAS WISE; FRANK WILLIS; PAUL GONZALEZ; CLIFFORD DEATHERAGE; EUGENE WEAVER; DARREL MEEKS; RANDALL SOUTHERN; TOMMY PETERS

       Plaintiffs - Appellants,

v.

HALE-HALSELL COMPANY, an Oklahoma corporation;,

       Defendant - Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 04-CV-98-GKF-FHM)**

---

Steven R. Hickman of Frasier, Frasier & Hickman, L.L.P., Tulsa, Oklahoma, for Plaintiffs - Appellants.

David E. Strecker (Jessica C. Ridenour, with him on the brief), Tulsa, Oklahoma, for Defendant - Appellee.

---

Before **KELLY**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiffs-Appellants, all former employees of Hale-Halsell Company (HHC), appeal the grant of summary judgment in favor of Defendant-Appellee HHC on their claim that HHC violated the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. §§ 2101-2109.  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

The WARN Act imposes a federal mandate on employers requiring 60 days advance notice to employees of a plant closing or a mass layoff.  Frymire v. Ampex Corp., 61 F.3d 757, 764 (10th Cir. 1995); see also 29 U.S.C. § 2102(a); 20 C.F.R. § 639.1(a).  The Act applies to any business that employs 100 or more employees, and the parties do not dispute that HHC is subject to its provisions. 20 C.F.R. § 639.3(a)(1)(i).  Congress acknowledged through specific exceptions to the WARN Act's notice requirements that notice is not always practicable or possible.  Id. §§ 639.1(e), 639.2, 639.9; 29 U.S.C. § 2102(b)(2)(A) (unforeseeable

- 4 -

business circumstance exception); see also Allen v. Sybase, Inc., 468 F.3d 642, 645 (10th Cir. 2006) ("An employer may be excused from the sixty-day notice requirement where a mass layoff was the result of an unforeseen business circumstance."). Notwithstanding, "an employer 'shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period.'" Allen, 468 F.3d at 646 (quoting 29 U.S.C. § 2102(b)(3)).

Plaintiffs were employed by HHC, a wholesale grocery warehouse and distribution center in Tulsa, Oklahoma. Gross v. Hale-Halsell Co., No. 04-CV-0098-CVE-FHM, 2006 WL 2666993, at *1 (N.D. Okla. Sept. 15, 2006); Aplt. App. 75. HHC owned fifty percent of United Supermarkets, which also happened to be HHC's largest customer. Aplt. App. 76, 77, 80. HHC and United had a satisfactory thirty-one-year business relationship with United Supermarkets providing forty percent of HHC's orders. Gross, 2006 WL 2666993, at *1; Aplt. App. 78. At times, HHC fell short on United's submitted orders, i.e., experiencing "stockouts," or "outs." For example, during the week of December 14, 2002, recorded stockouts hit 6%; in the week of December 28, 2002, stockouts hit 6.3%; and by the end of November 2003, stockouts had reached as high as 18.9%. Aplt. App. 173. A United official testified that, as of the end of November 2003, despite HHC's failure to fulfill United's orders, United was not "sure what was going to happen," but that United was not considering terminating

its relationship with HHC at that time. Aplt. App. 91. By January 7, 2004, stockouts had reached an "all time high" of 53.8%, Aplt. App. 168, but United still had not decided to end the relationship, Aplt. App. 172. During this same period, HHC was awaiting approval of a working capital loan from LaSalle Bank. Aplt. App. 95-96. In November 2003, LaSalle felt "positive" about the loan being approved, and as late as December 8, 2003, LaSalle was still considering a $15 million loan to HHC. Aplt. App. 96-98, 120-25. However, at some point after United's announcement in January 2004, it appears that LaSalle declined to approve the funding. Aplt. App. 99, 184.

HHC and United communicated on various occasions about HHC's failure to satisfy United's orders. In November and December 2003, "there was a lot of conversation back and forth" about the issue. Aplt. App. 83, 175. On December 17, 2003, United began asking HHC to inform United of available stock, so United could advertise for those items instead of for the "out" items. Aplt. App. 191, 87. By then, HHC's warehouse operations were struggling, but LaSalle auditors were on the premises collecting information. Aplt. App. 191. On January 8, 2004, United wrote to let HHC know that United would have to "place orders with alternative suppliers," but also reiterated its willingness to continue doing business with HHC despite the stockouts. Aplt. App. 100. In essence, United was "not saying that [it] want[ed] to discontinue ordering from [HHC] or that United [was] terminating its supply relationship with [HHC]," but rather

warning HHC that its orders would be declining. Aplt. App. 100. On January 9, 2004, HHC replied, informing United of various business developments and assuring United that it expected to hear from LaSalle shortly regarding the loan. Aplt. App. 102. Then, on Thursday, January 15, 2004, United wrote to HHC, informing HHC of the difficult decision it had made to "use Affiliated Foods as its primary supplier, with [HHC] as a secondary supplier. That decision is going to affect the volume of orders that United places with [HHC]." Aplt. App. 104. On Friday, January 16, 2004, HHC replied to United, indicating that its decision would "put [HHC] in a bad situation," but still expressing hope that HHC would "solve [its] difficulties." Aplt. App. 159.

Events after the January 16 letter unfolded as follows. In 2004, Martin Luther King Jr. Day fell on Monday, January 19, and banks were closed, so HHC met with F&M Bank, its primary accounts holder, as well as consultants Alvarez & Marsal, on Tuesday, January 20. Aplt. App. 106. It was after those meetings that HHC "decided that [it] was not going to be able to survive." Id. The next day, Wednesday, January 21, 2004, HHC met with office personnel and later warehouse staff, informing them of the impending layoffs. Aplt. App. 107. The approximately 200 individuals to be laid off would be informed by notice included in their paychecks the following day. Id.; see also Aplt. App. 75, 160. That same day, the Associated Press issued a news release indicating that HHC had announced that it would "lay off about 200 Tulsa warehouse workers after

losing a key customer." Aplt. App. 160. HHC President Rob Hawk was quoted in the news release as stating, "[United's] unexpected action has had a dramatic impact not only on [HHC], but on the lives of so many of our long-term, valued employees and [the] Tulsa community."[1] Id. Finally, on Thursday, January 22, 2004, HHC informed employees by letter that they would be laid off, citing as the reason the loss of United as its primary customer. Aplt. App. 158. HHC later filed for bankruptcy. Aplt. App. 117.[2]

Thereafter, Plaintiffs brought this action and HHC moved for summary judgment on the basis that it was excused from the WARN Act requirements based upon the unforeseeable business circumstance exception, 29 U.S.C. § 2102(b)(2)(A); 20 C.F.R. § 639.9(b), and the faltering company exception, 29 U.S.C. § 2102(b)(1); 20 C.F.R. § 639.9(a). The district court granted summary judgment based upon the former exception, holding that United's termination of HHC was unforeseeable and caused the mass layoffs, and that HHC had provided notice "as soon as practicable." Gross, 2006 WL 2666993, at *10-12. Plaintiffs appeal, arguing the district court did not view the facts in the light most favorable

---

[1] United indicated in testimony that it was "very upset" that HHC had laid the blame on it, because they "didn't quit HHC." Aplt. App. 87.

[2] On January 6, 2004, HHC received an email from the law firm of Conner & Winters, indicating that HHC ought to consider preparing for a "possible" bankruptcy filing, however remote, but that the primary goal was to avoid filing. Aplt. App. 161-62; see also Aplt. App. 189 (testimony of Michael Owens, former HHC secretary-treasurer) (stating that at the end of 2003 bankruptcy "just wasn't what [HHC] wanted to do").

to the non-moving party when it held that (1) the unforeseeable business circumstance exception applied to HHC, and (2) HHC gave notice of the layoffs "as soon as practicable." Aplt. Br. 7, 14-16.

## Discussion

We review the grant of a motion for summary judgment de novo, and apply the same standard as the district court. T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir. 2008). In a civil case, we ask ourselves whether, by a preponderance of the evidence, the moving party has established that it is entitled to a favorable verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In doing so, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." T-Mobile, 546 F.3d at 1306 (internal citations omitted). In sum, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

## I.     The Unforeseeable Business Circumstance Exception

The WARN Act requires employers to give at least sixty days' notice in advance of a mass layoff, 20 C.F.R. § 639.2, calculated from a fourteen-day window during which the layoff is expected to occur, 20 C.F.R. § 639.7(b); Hotel

Employees and Rest. Employees Int'l Union Local 54 v. Elsinor Shore Assocs., 173 F.3d 175, 187 (3d Cir. 1999). Under 29 U.S.C. § 2102(b)(2)(A), "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." The "employer bears the burden of proof that conditions for the exceptions have been met." 20 C.F.R. § 639.9. To satisfy these conditions, the defending party must establish that (1) the circumstance was unforeseeable, and (2) the layoffs were caused by that circumstance. See Roquet v. Arthur Andersen LLP, 398 F.3d 585, 588 (7th Cir. 2005).

### A.     Foreseeability

An "important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). For example, a "principal client's sudden and unexpected termination of a major contract with the employer . . . might . . . be considered a business circumstance that is not reasonably foreseeable." Id. The regulations instruct that the test for foreseeability "focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its

- 10 -

particular market." Id. § 639.9(b)(2). The Department of Labor has indicated that the exception should not be narrowly construed, that we apply an objective test to analyze the "commercial reasonableness of the employer's actions," and that "[e]ach claim of unforeseeable business circumstances must be examined on its own merits . . . in terms of whether the employer reasonably . . . could not foresee that the event would occur . . . ." Employment and Training Administration, 54 Fed. Reg. 16,042, 16,061-63 (April 20, 1989) (codified at 20 C.F.R. pt. 639).

Plaintiffs argue that the grant of summary judgment was improper because they presented a genuine issue of material fact as to whether the unforeseeable business circumstance exception applied to HHC. See Aplt. Br. 7-14. They argue that the facts relied upon by the district court were legally insufficient and not conclusively established. The disputed facts are as follows: (1) that HHC and United had suffered through similar business difficulties before and their relationship had survived, (2) that HHC had reason to believe its financial position would improve over time, and (3) that HHC had reason to believe its relationship with United would continue because of a long-standing relationship between the parties. See Aplt. Br. 8-9.

In Loehrer v. McDonnell Douglas Corp., the Eighth Circuit explored the application of the unforeseeable business circumstance exception, stating that, in

light of the commercially reasonable business judgment test, the WARN Act

> necessarily recognize[s] that even the most conscientious employers
> are not perfect, and . . . thus allow[s] needed flexibility for
> predictions about ultimate consequences that, though objectively
> reasonable, proved wrong.  So long as it may still fairly be said that
> the eventual plant closing or mass layoff is caused by a sudden,
> dramatic, and unexpected event outside the employer's control, the
> exception applies.

98 F.3d 1056, 1061 (8th Cir. 1996).  Just as in that case, where the United States government withdrew its support for a new fighter plane, resulting in private contractors laying off employees, we believe that the facts of the instant case also "fall squarely within the exception for unforeseeable business circumstances."  Id. at 1062.  Moreover, we take heed of the Fifth Circuit's reasoning that "it is the probability of occurrence that makes a business circumstance 'reasonably foreseeable' and thereby forecloses use of the [exception] to the notice requirement.  A lesser standard would be impracticable."  Halkias v. Gen. Dynamics Corp., 137 F.3d 333, 336 (5th Cir. 1998); see also Watson v. Mich. Indus. Holdings, Inc., 311 F.3d 760, 765 (6th Cir. 2002) ("WARN was not intended to force financially fragile, yet economically viable, employers to provide WARN notice and close its doors when there is a possibility that the business may fail at some undetermined time in the future.  Such a reading of the Act would force many employers to lay off their employees prematurely . . . .").  Therefore, we do not rely on the mere possibility that layoffs will occur, but

rather look for their probability.

At the end of 2003, HHC was experiencing "financial difficulties that affected its relationship with its largest customer, United." Gross, 2006 WL 2666993, at *9. These difficulties culminated in United's January 8, 2004, letter, indicating that it would be placing orders with other suppliers and that HHC should not be "surprised that the orders from United [would] declin[e]." Aplt. App. 100-02. As noted above, the stockouts at the close of 2003 had increased from the same time the year before, and United's orders had decreased in the same fashion. Aplt. App. 168, 173. However, even with these facts known to it, United simply did not decide until its January 15, 2004 letter to terminate its primary supplier relationship with HHC. Aplt. App. 103-04

While HHC was aware of United's dissatisfaction, that knowledge alone does not bar the application of the unforeseeable business circumstance exception. See Loehrer, 98 F.3d at 1062. Rather, an objective focus is required—whether a "similarly situated employer in the exercise of commercially reasonable business judgment would have foreseen" United's withdrawal. Elsinore Shore, 173 F.3d at 186. In this evaluation, "we consider the facts and circumstances that led to the [layoffs] in light of the history of the business and of the industry in which that business operated." Id. While the situation leading up to United's eventual termination of the primary supplier relationship "would undoubtedly raise the

- 13 -

eyebrows of any prudent businessperson," Loehrer, 98 F.3d at 1062, the evidence does not suggest that United's decision was reasonably foreseeable prior to HHC's receipt of the January 15 letter. For thirty-one years, United's relationship with HHC had flourished, and even when stockouts reached a new high in early 2004, United still confirmed its interest in doing business with HHC. See Aplt. App. 100-01; see also Local Union 7107 v. Clinchfield Coal Co., 124 F.3d 639, 643 (4th Cir. 1997) (indicating that a thirty-year business relationship contributes to an employer's expectation that the relationship would continue). In fact, United, in its January 8 letter, indicated that it valued its longstanding relationship with HHC a great deal, reiterated that the relationship had provided mutual benefit over the years, and acknowledged its hope that the LaSalle loan negotiations would close successfully. Aplt. App. 100. Moreover, even though HHC's warehouse operations had been disrupted, LaSalle continued to gather information concerning HHC to determine whether it would approve a sizeable loan and remained "positive" about the financing even in December 2003. See Aplt. App. 96-98, 120-25, 191. In addition, HHC's own attorneys indicated that the company should focus on "turnaround efforts," and stated that the "avoidance of bankruptcy filings" was one of its primary goals, in addition to "planning for the possibility, however remote, of bankruptcy filings." Aplt. App. 162.

Free enterprise always involves risk, yet most businesses operate as going concerns, notwithstanding those risks. Business downturns in a cyclical economy

are not unusual, and we should not burden employers with the "task of notifying employees of possible contract cancellation and concomitant lay-offs every time there is a cost overrun" or similar difficulty.  Halkias, 137 F.3d at 336.   Such an indiscriminate practice could undermine morale, let alone exacerbate the problem. Such difficulties are invariable, and "most often do not lead to contract cancellation."  Id.   Here, HHC experienced the loss of a major customer in a very short period of time on top of all of its other difficulties; HHC met its summary judgment burden of establishing that United's January 15, 2004, withdrawal, while always a possibility, was unforeseeable.

      B.    <u>Causation</u>

Plaintiffs further argue that HHC failed to establish causation. Specifically, Plaintiffs dispute that United's termination of HHC as its primary supplier effected no actual change in the amount of business HHC was conducting with United, and that therefore the January 15 announcement was not the "cause" of the layoffs.  See Aplt. Br. 13; see also 29 U.S.C. § 2102(b)(2)(A) ("An employer may order a . . . mass layoff before the conclusion of the 60-day period if the . . . mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.").

We disagree.  Plaintiffs point to other HHC financial problems that could have contributed to the layoffs; however, we can find no evidence in this record

- 15 -

to support the claim that United's withdrawal was not the ultimate "straw that broke the camel's back." Aplt. App. 78 (testimony of Robert Hawk, Sr., former chairman and chief executive officer of HHC). Plaintiffs' main argument is that United's withdrawal effected no actual change in the volume of business being transacted between the two companies, and that therefore it could not have been the cause of HHC's decision to lay off its employees. See Aplt. Br. 13. A review of the timeline of events leading to the layoffs refutes this claim. HHC's decision to shut down came in the immediate wake of United's withdrawal. While it had been suffering from financial troubles for months, as evidenced by its negotiations with LaSalle, its struggles with subsidiary companies, and the increasing number of stockouts, the decision to lay off employees only came when it received the withdrawal letter from United. In fact, up until that point, HHC had repeatedly communicated with United that HHC was about to "turn[] the corner." Aplt. App. 102. The downturn was not industry-wide, given that United's new supplier was "doing a lot better job of meeting United's needs" and was providing better pricing, promotions, and rebates. Aplt. App. 104. Moreover, that the January 15 withdrawal may not have affected the actual volume of business being conducted between the two companies is of no import—the fact remains that HHC had a reasonable hope that business would improve with the LaSalle financing and that United would maintain the relationship. See Jones v. Kayser-Roth Hosiery, Inc., 748 F. Supp. 1276, 1285-86

(E.D. Tenn. 1990) (holding that the loss of a major account satisfied the causation prong of the unforeseeable business circumstance exception).  With United's withdrawal, hope was vitiated—HHC permanently lost forty percent of its potential business and operating the warehouse profitably was even less likely. The facts here unequivocally support the conclusion that United's withdrawal was the cause of HHC's decision to lay off its workers.

## II.    Required Notice

The unforeseeable business circumstance exception also requires an employer to "give as much notice [of the layoff] as is practicable" upon knowledge of the causal event.  29 U.S.C. § 2102(b)(3).  Plaintiffs argue that a jury could have found in their favor that the written notice given to employees in their paychecks on January 22, 2004, was not delivered as soon as practicable. See Aplt. Br. 16.  Other than pointing out that HHC knew of United's withdrawal on January 16, and that news of the layoffs were reported in the media on January 21, 2004, Plaintiffs offer no other evidence that HHC unduly delayed in advising employees of the layoffs.  Id.  As discussed, HHC behaved in a commercially reasonable way when it failed to foresee United's withdrawal in the sixty days leading up to the January 15 letter.  HHC then took three business days to discuss the matter with its financial advisers and lawyers, and acted quickly in light of the devastating news.  We do not think HHC violated the WARN Act's notice

requirements, nor did it act unreasonably, in taking just three business days to determine whether "it could survive the carnage." Roquet, 398 F.3d at 590 (stating that a "company, faced with [an] unprecedented cataclysmic event, reasonably needed a little time to assess how things would shake out" before delivering notice to its employees). The district court properly granted summary judgment on this issue as well.

AFFIRMED.