# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2013

No. 12-60242

Lyle W. Cayce
Clerk

In the Matter of:  FLEXIBLE FLYER LIQUIDATING TRUST,

Debtor

------------------------------

DAVID D. ANGLES; GRADY BARCLAY; MEGAN BIBBS; PEARLY
BILLUPS; ROMELL BLACK; ET AL,

Appellants

v.

FLEXIBLE FLYER LIQUIDATING TRUST, formerly known as FF
Acquisition Corporation, doing business as Flexible-Flyer,

Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:11-CV-31

Before JOLLY, PRADO, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-60242

This appeal addresses an employer's duty to notify employees of a plant closing and mass layoff under the Worker Adjustment and Retraining Notification Act ("WARN Act"), where lenders suddenly and without advance notice completely terminated the company's financing. The question presented is whether such circumstance satisfies the WARN Act exception for "unforeseeable business circumstances." The case largely turns on the factual findings of the bankruptcy court. Because the findings are not clearly erroneous, we AFFIRM.

## I.

Cerberus Capital Management Corp. ("Cerberus"), a private equity hedge fund, formed the now bankrupt Flexible Flyer in 1997 to purchase the assets of a bankrupt company. Flexible Flyer manufactured swing sets, hobby horses, go-carts, utility vehicles, and fitness equipment. These products were sold to a variety of retailers, including Wal-Mart, Toys-R-Us, K-Mart, and Sam's Club.

Flexible Flyer never made a profit–indeed it constantly lost money–but hope and a few good signs kept it going. Until late 2000, Flexible Flyer was funded entirely by its parent company, Cerberus. During this time, Cerberus infused Flexible Flyer with $85 million in capital. In late 2000, Flexible Flyer obtained an additional source of operating capital when it entered into a factoring arrangement with CIT Group Commercial Systems, LLC ("CIT"). Under this arrangement, Flexible Flyer assigned its eligible accounts receivables to CIT, and CIT advanced Flexible Flyer 80% of the receivables that it acquired. The factoring arrangement with CIT and occasional capital infusions from Cerberus were Flexible Flyer's primary sources of operating funds during its struggling existence.

CIT and Cerberus closely monitored Flexible Flyer's financial performance, because, as we have indicated, Flexible Flyer consistently operated at a deficit. Each year, Cerberus told Flexible Flyer that it would shut Flexible

No. 12-60242

Flyer down if it did not become profitable within a year. But, despite the failure to make a profit and despite issuing these warnings year after year, Cerberus never took the steps to close Flexible Flyer. Cerberus continued to provide capital and did not refuse Flexible Flyer's requests for additional funding when Flexible Flyer indicated that more funding was essential for its continued operation.

In 2005, Flexible Flyer's situation became even more tenuous. It experienced a number of financial problems, and the company notified its employees in April of possible layoffs in the go-cart section. Two months later, Flexible Flyer was forced to recall 10,000 go-carts because of defective parts. Around this same time, Wal-Mart, K-Mart, and Toys-R-Us notified Flexible Flyer that they would be deferring the purchase of approximately $5 million in swing sets until the next year. Another customer, Tractor Supply Company, withheld $300,000 in payments for merchandise that had already been shipped.

Michael Earrey, Flexible Flyer's Chief Financial Officer, took a number of actions attempting to address these problems. In August 2005, he convinced Wal-Mart to pay its invoices sooner, and several vendors agreed to defer payments due from Flexible Flyer. Earrey was less successful, however, in convincing some customers, most notably Wal-Mart, to provide written commitments regarding projected delivery dates or future orders. Despite the lack of written commitments, Earrey testified that he remained optimistic Flexible Flyer could weather the storm. During this time, Flexible Flyer's primary domestic competitor had filed for bankruptcy protection, leaving Flexible Flyer as the only U.S. manufacturer of swing sets. Fewer competitors gave Earrey a reason to be encouraged about Flexible Flyer's future.

Recognizing that it needed additional funds to operate, Flexible Flyer consulted with an attorney in August 2005 to explore all of its options. Among those options were exiting the go-cart business completely, selling the fitness

No. 12-60242

equipment business, or possibly filing for Chapter 11 bankruptcy protection. Before Flexible Flyer decided on which course of action to take, however, CIT reduced its credit line. Instead of continuing to advance Flexible Flyer 80% of its receivables, CIT cut the amount to 50%. Earrey believed that Flexible Flyer could continue to operate at the 50% rate, but two weeks after the initial cut, CIT informed Flexible Flyer that it would no longer be advancing credit at all. Earrey attempted to get funding from Cerberus, but this time, Cerberus refused. With no cash to operate, Flexible Flyer was forced to file for bankruptcy on September 9, 2005, two days after CIT terminated all funding. That same day, Flexible Flyer notified its employees that it would be terminating business operations, resulting in company-wide layoffs.

A group of over 100 former Flexible Flyer employees filed an adversary action in Flexible Flyer's bankruptcy proceeding, alleging that Flexible Flyer was liable under the WARN Act for failing to give them the required sixty-day layoff notice. Both parties agreed that there were more than 100 employees involved, that Flexible Flyer had failed to give the sixty-day notice, and that consequently the WARN Act applied. After a bench trial, the bankruptcy court determined, however, that Flexible Flyer was excused from providing advance notice because it had established that the shutdown was the result of an unforeseeable business circumstance.[1] The court credited Earrey's testimony, finding that the abrupt unavailability of operating funds caused the layoffs and that the sudden lack of funds was completely unanticipated. The court concluded that "[t]he shutdown of Flexible Flyer and the mass layoffs were not planned, proposed, or foreseeable" and found that Flexible Flyer had provided

---

[1] The bankruptcy court determined that another exception also applied—the faltering business exception—but it found the unforeseeable business circumstance exception to be more compelling. Because we find that the bankruptcy court correctly found that the unforeseeable business circumstance exception applied, we do not reach the faltering business exception.

4

No. 12-60242

WARN Act notice at "the earliest practical date that such a notice could be provided."

The employees appealed to the district court, which held that "the factual determinations made by the [bankruptcy] court were not clearly erroneous, and the legal conclusions were thorough and correct." This timely appeal from the district court's judgment followed.

## II.

We review the district court's decision using the same standard that the district court used to review the bankruptcy court's findings of fact and conclusions of law. *Gen. Electric Capital Corp. v. Acosta* (*In re Acosta*), 406 F.3d 367, 372 (5th Cir. 2005). "A bankruptcy court's findings of fact are subject to review for clear error, and its conclusions of law are reviewed *de novo.*" *Morrison v. W. Builders of Amarillo, Inc.* (*In re Morrison*), 555 F.3d 473, 480 (5th Cir. 2009). In reviewing for clear error, we "will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks omitted).

## III.

The WARN Act, 29 U.S.C. §§ 2101–2109, requires covered employers who are planning a plant closing or mass layoff to give affected employees sixty days notice of such action. 20 C.F.R. § 639.2. Advance notice is meant to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining." *Id.* § 639.1. There are exceptions, however, that excuse employers who fail to provide the required notice. *See id.* § 639.9. If a WARN Act exception applies, employers are required to give only "as much notice as is practicable." *Id.*

The unforeseeable business circumstance exception applies when the closing or layoff was "caused by business circumstances that were not reasonably

5

foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A); *see also* 20 C.F.R. § 639.9(b). Closings and layoffs are not foreseeable when "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). In assessing the foreseeability of business circumstances, our focus is "on an employer's business judgment." *Id.* § 639.9(b)(2). An employer is required only to "exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." *Id.*

We previously have stated that where it only is possible that the business circumstance at issue may occur, such circumstances are not reasonably foreseeable. *See Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998). Rather, "it is the probability of occurrence that makes a business circumstance 'reasonably foreseeable' and thereby forecloses use of the [unforeseeable business circumstances] exception." *Id.* For example, in *Halkias*, there was "no doubt that the evidence showed General Dynamics' board of directors knew of the possibility of contract cancellation and mass lay-offs as early as June, 1990," when notice was not given until December 21, 1990. *Id.* But, we ultimately concluded that the board of directors' knowledge of the potential business circumstance, contract cancellation, did not make the circumstance's occurrence reasonably foreseeable. *See id.* Cancellation was a possible outcome, not necessarily a probable one, and it was a circumstance outside of the board of directors' control. *See id.*; *see also Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1281–82 (5th Cir. 1994).

Here, the bankruptcy court was the finder of fact. It determined that the September 9, 2005 closing of Flexible Flyer's business was not reasonably foreseeable. The record showed that sixty days before the shutdown, Flexible Flyer was undisputedly experiencing financial difficulties. But, even so, there

was no indication that a company shutdown was imminent. Indeed, the bankruptcy court credited Earrey's testimony that, until almost the last moment, he had been working tirelessly to turn the company around and was considering a number of cost-saving measures designed to keep the company operating for as long as possible. Moreover, Flexible Flyer's position in the market had improved as a result of its competitor's demise, and Earrey had presented Wal-Mart with projections for Flexible Flyer's 2006 operations, demonstrating his belief that the company would continue operations into the new year. Earrey also testified that he was considering options for "an orderly downsizing of the business over time, not an immediate shutdown." All of the evidence proffered thus shows that the focus of Flexible Flyer's management was on saving the company, not planning for an upcoming shutdown. Based on Earrey's testimony, the bankruptcy court found that, "Earrey's exercise of his business judgment, in keeping Flexible Flyer going and in anticipating that Flexible Flyer would continue operations into 2006, was completely reasonable." We cannot say that the bankruptcy court clearly erred in crediting Earrey's testimony or in concluding that his exercise of business judgment was reasonable under the circumstances.

The holdings of the bankruptcy and district courts are further supported by the showing that during the time period immediately preceding the closure, Flexible Flyer still had financing in place from CIT, as well as back-up funding from Cerberus, who had never refused Flexible Flyer's previous requests for additional capital. It was only when CIT and Cerberus both decided to cut off funding completely, and did so almost simultaneously without warning, that the shutdown became inevitable. Earrey testified that he had "no clue" that CIT was going to cut funding, and Cerberus's refusal to provide capital was a sudden departure from its prior actions in response to Flexible Flyer's funding requests. Again crediting Earrey's testimony, the bankruptcy court concluded that the

No. 12-60242

"abrupt unavailability of operating funds" caused the layoffs, and that CIT and Cerberus's actions were "completely unanticipated." Nothing in the record suggests that these findings and conclusions were clearly erroneous.

The arguments of the former employees suggest that the sixty days notice should have been issued sometime following the June 2005 go-cart recall. Contrary to the contention of the former employees, Flexible Flyer's financial difficulties in July and in the ensuing weeks, do not establish the foreseeability of a complete withdrawal of funding; nor consequently, the company's sudden closure on September 9, 2005. As noted above, the bankruptcy court credited Earrey's testimony that CIT and Cerberus's decision to cut all funding was an unanticipated event taking place two days before the shutdown. Under *Halkias* and the WARN Act regulations, the focus of the analysis of this appeal must be on the probability that the plant closure and subsequent layoffs would occur, and the employer's exercise of business judgment. It is true that Flexible Flyer's financial condition was perilous for much of its eight-year existence. But it is also true that encouraging events continued to renew probabilities that better days may be ahead. The WARN Act allows good faith, well-grounded hope, and reasonable expectations. Its regulations protect the employer's exercise of business judgment and are intended to encourage employers to take all reasonable actions to preserve the company and the jobs. Holding Flexible Flyer liable for a WARN Act violation on the facts found by the bankruptcy court would serve only to encourage employers to abandon companies even when there is some probability of some success.

Thus, we hold that the bankruptcy court did not err in finding Earrey's testimony credible; based on his testimony, he pursued numerous options to save Flexible Flyer up until the sudden termination of all funding by CIT and Cerberus. Termination of outside funding may have always been possible, but it cannot be said on the record before us that Flexible Flyer probably knew

8

during or before July 2005 that it would be stripped of funding, causing an immediate shutdown. This case presents a convincing example of an event that meets the unforeseeable business circumstance exception. The bankruptcy court correctly concluded that the exception applied in this case. The district court's judgment therefore is

AFFIRMED.