FILED
United States Court of Appeals
Tenth Circuit

April 3, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE ESTATE OF JEREMY HUNTER, by
its personal representative, Brian Hunter,

     Plaintiff - Appellant,

v.

UINTAH COUNTY; KATIE SMITH;
COLE ANDERTON; RICHARD
GOWEN; CAITLYN GURR; CODY
HARRISON; TONY JENSEN; DAREN
KELLY; GALE ROBBINS,

     Defendants – Appellees.

No. 19-4086
(D.C. No. 2:16-CV-01248-TS)
(D. Utah)

_____

**ORDER AND JUDGMENT[*]**
_____

Before **MATHESON**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

Plaintiff-Appellant, the Estate of Jeremy Hunter (the Estate) by its personal

representative Brian Hunter, appeals from the district court's grant of summary

judgment in favor of individual Defendants-Appellees and Uintah County. The

district court held that the Estate could not recover on its Eighth Amendment claim

for the death of Jeremy Hunter at Uintah County Jail in Vernal, Utah (the Jail). On

appeal, the Estate argues that the district court erred in relying on hearsay and

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

double-hearsay statements and that ample evidence exists for a jury to find that each defendant acted with deliberate indifference. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**Background**

On December 18, 2014, Mr. Hunter was booked into the Jail, where he had been incarcerated previously. Each time he filled out a medical questionnaire and stated that he had high blood pressure for which he was taking medication. With the exception of his final questionnaire, each noted that he had a heart condition and a history of heart attacks. This time, Mr. Hunter told Deputy Cole Anderton about his high blood pressure and medications (which he did not have with him), but that he was not in pain and did not need immediate care. Deputy Anderton relayed this information to the nurse on duty, Susan Smuin.[1]

On his second day at the Jail, Mr. Hunter requested that Nurse Smuin take his blood pressure. The machine and manual readings showed an elevated blood pressure. Nurse Smuin arranged for Mr. Hunter's blood pressure medications to be supplied the following morning.

Corporal Gale Robbins came on shift at 6 pm that evening. The previous shift supervisor, Corporal Richard Gowen, told him about Mr. Hunter's complaints. Nurse Smuin told him that she and physician assistant (PA) Logan Clark had seen Mr.

---

[1] Nurse Smuin passed after the events of this case.

2

Hunter and that Mr. Hunter should be fine through the night. Mr. Hunter complained of numbness around 7:15 pm that evening to Deputy Cody Harrison. Mr. Hunter's blood pressure was taken. Deputy Harrison gave Mr. Hunter ibuprofen and a decongestant.

Mr. Hunter's condition fluctuated throughout the night. A few hours after he took the ibuprofen, Mr. Hunter had serious, sharp pain and was on the floor on his hands and knees, spitting saliva. Deputies Caitlyn Gurr, Cody Harrison, Tony Jensen, and Daren Kelly (who are each among the Defendants-Appellees) responded. The Estate alleges that the deputies made several uninformed medical decisions, including trying to slow down his breathing and treat him for a panic attack or detox from drugs. None checked Mr. Hunter's medical file or were aware of his high blood pressure issues. After Corporal Robbins arrived, he asked whether Mr. Hunter wanted to move to booking to be more closely monitored. Mr. Hunter declined and said he wanted to stay with his cellmate but move to the bottom bunk. Corporal Robbins and the deputies made Mr. Hunter comfortable in his cell by moving the mattress. Mr. Hunter said he was "ok and just needed to lie down." He was told he should alert Jail staff if his condition worsened. See 2 Aplt. Appx. 90; 92–94.

Corporal Robbins testified that around 11:30 pm, he called Nurse Smuin personally to discuss Mr. Hunter's condition, including his elevated blood pressure and anxiety. She said Mr. Hunter would have his medications the next morning, he did not need to go to the hospital, and Corporal Robbins should watch him overnight.

3

She also said that PA Clark had visited Mr. Hunter and told her there was no need to go to the hospital and that Mr. Hunter's heart was not the issue.  2 Aplt. Appx. 133.

At about 2:30 am, Mr. Hunter complained of chest pain and anxiety, so Corporal Robbins had him moved to the booking area where he could be watched more closely.  At about 3:15 am, Corporal Robbins called Nurse Kate Smith, who was off-site.  He told her of Mr. Hunter's complaints and that his blood pressure was normal at 111/80.  See 2 Aplt. Appx. 116–17.  Nurse Smith did not know about Mr. Hunter's medical conditions, or his previous blood pressure readings, and, as she was not at the Jail, she did not check his file to find out.  She directed Corporal Robbins to have Mr. Hunter drink water and try to relax until her shift started at 6 am.  Id. at 117.

Corporal Robbins gave Mr. Hunter clean clothes and clean blankets.  Corporal Robbins reports that Mr. Hunter said "Man, I haven't felt this good all night."  4 Aplt. Appx. 499.  Around 5:30 am, Mr. Hunter was standing up and Corporal Robbins asked him how he was feeling, and he responded, "Man, better.  I haven't felt so good for a long time.  I got some sleep."  Id. at 500.

Around 6:15 am, Mr. Hunter told Nurse Smith that he felt like he did when he had a heart attack several years before.  His blood pressure was 140/98.  2 Aplt. Appx. 94, 3 Aplt. Appx. 238.  She noted that Mr. Hunter was alert, not sweating, and had good range of motion with his left arm.  She told Mr. Hunter that she would pick up his medication when the pharmacy opened that morning.  1 Aplt. Appx. 41–42.

4

Corporal Gowen, who had come on shift that morning, was in the booking area and observed Mr. Hunter while performing normal Jail duties. Id. at 42.

Around 8:15 am, Mr. Hunter told Nurse Smith that he had vomited. Nurse Smith gave him an over-the-counter medication for nausea and again took his vital signs, which were within the normal ranges. Id. She then called Nurse Smuin, her supervisor, who told her to keep monitoring him and get his medication. 2 Aplt. Appx. 94.

Around 9:15 am, Mr. Hunter's health failed. Nurse Smith picked up Mr. Hunter's prescription. She visited Mr. Hunter again and she reports he was walking around with clear speech. She immediately gave him his medication. During their conversation, he clutched his chest and collapsed to the floor, hitting his head on the wall as he fell. Id. at 95–96. He was transported to the hospital and declared dead at 10:00 am. Dr. Todd Grey performed an autopsy and found that Mr. Hunter's cause of death was pericardial tamponade due to aortic dissection. Id. at 188.

The district court granted the defendants' motion for summary judgment, holding that the individual defendants "acted reasonably on the information they knew" and the plaintiff had not identified an unconstitutional official custom or policy of Uintah County. Estate of Hunter v. Uintah Cty., No. 2:16-CV-1248 TS, 2019 WL 2422499, at *6, 8, 10 (D. Utah June 10, 2019).

5

## Discussion

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. Gross v. Hale-Halsell Co., 554 F.3d 870, 875 (10th Cir. 2009). Summary judgment is appropriate if the moving party establishes that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the nonmoving party. Gross, 554 F.3d at 875.

At the outset, the Estate does not expressly argue on appeal that Uintah County, a named defendant, is liable. Nor can we agree that the issue was implicitly raised. Aplt. Reply Br. at 2. "When a party omits an argument from its opening brief, an appellate court has no obligation to consider that argument." United States v. Bowline, 917 F.3d 1227, 1231 (10th Cir. 2019), cert. denied, No. 19-5563, 2020 WL 872247 (U.S. Feb. 24, 2020) (citing United States v. Abdenbi, 361 F.3d 1282, 1289 (10th Cir. 2004)). We therefore only consider arguments for holding the individual defendants liable.

The Estate first challenges the district court's reliance on the phone call that Corporal Robbins made to Nurse Smuin about Mr. Hunter's condition. It argues that Nurse Smuin's statements are hearsay (and some, double hearsay) not subject to any exception and the district court should not have considered her statements at summary judgment. We will not consider this argument because the Estate did not make any hearsay objections before the district court. It did not present this issue in its summary judgment briefing. See Fed. R. Civ. P. 56(c)(2) (requiring a party to

6

object that a fact is not supported by admissible evidence). Because the issue was not raised below, it is waived. See Singleton v. Wulff, 428 U.S. 106, 121 (1976); Lyons v. Jefferson Bank & Tr., 994 F.2d 716, 721 (10th Cir. 1993). Nor should we conduct plain error review because "the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court." Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1131 (10th Cir. 2011).

Next, the Estate argues that the district court erred in holding that no reasonable jury could find that the jailers acted with deliberate indifference. This claim is based on the Eighth Amendment, prohibiting cruel and unusual punishment. U.S. Const. amend. VIII. The Eighth Amendment requires humane conditions of confinement, including medical care. Delay in providing medical care can also give rise to liability. See Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999).

To hold a jailer personally liable, a plaintiff must show both objective and subjective deliberate indifference. Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998). Jailers who knew about a risk and acted reasonably cannot be found liable, even if the harm was not averted. Farmer v. Brennan, 511 U.S. 825, 844–45 (1994). In the case of medical needs, the standard is whether a doctor has mandated treatment or whether the risk is so obvious that a lay person would "easily recognize the necessity for a doctor's attention." Hunt, 199 F.3d at 1224 (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).

7

The subjective component is met if a defendant knows of and disregards an excessive risk to the inmate's safety. "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." Self v. Crum, 439 F.3d 1227, 1234 (10th Cir. 2006). Even medical malpractice would not give rise to a constitutional violation if the defendant did not have subjective knowledge of the risk. Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999). Jailers who mistake one risk for another are not liable. See Martinez v. Beggs, 563 F.3d 1082, 1090 (10th Cir. 2009) (declining to hold officers liable who thought an inmate was just intoxicated when he later suffered a heart attack).

Here, Defendants do not contest that Mr. Hunter suffered from an objectively serious medical need that resulted in his passing. Aplee. Br. at 26. However, the Estate cannot meet the subjective element of the test. None of the defendants understood the medical risk that Mr. Hunter actually faced, and they all took reasonable action to mitigate the risk they thought he faced. Merely because symptoms could point to other conditions does not create a triable issue as to deliberate indifference. Self, 439 F.3d at 1227.

The Estate argues that the reasonable response to Mr. Hunter's symptoms — and the response required by the jail's procedures — was to transport him to the hospital when the jailers found him in pain on his hands and knees, and failure to do so is deliberate indifference. Aplt. Br. at 29–33. But this ignores that Mr. Hunter's

8

condition fluctuated throughout and at times, he appeared to be improving. He even told the jailers at a few points that he was "okay." See, e.g., 2 Aplt. Appx. 90.

The Estate cannot show that any defendant subjectively knew and disregarded a substantial risk of serious harm. At bottom, although the defendants took steps to ameliorate Mr. Hunter's condition, they were wrong about the risk that Mr. Hunter faced, which does not satisfy the subjective component of the deliberate indifference test. See Farmer, 511 U.S. at 844; Self, 439 F.3d at 1234 ("[A] misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim.").

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

9